**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| 45 SPIRITS LLC, RICHARD DECICCO, and TIMOTHY KLINTWORTH,<br><br>Plaintiffs,<br><br>v.<br><br>ZOHAIR SULTAN, SAMEET PATEL, 47 SPIRITS LLC, 47 SPIRITS HOLDINGS LLC, and 47 SPIRITS HOLDINGS MGR LLC,<br><br>Defendants. | Case No. 1:26-cv-04902 |

# COMPLAINT

Plaintiffs 45 Spirits LLC, Timothy Klintworth, and Richard DeCicco (together, "45 Spirits"), for their complaint against Defendants Zohair Sultan, Sameet Patel, 47 Spirits LLC, 47 Spirits Holdings LLC, and 47 Spirits Holdings MGR LLC (together, "47 Spirits"), hereby allege as follows:

## INTRODUCTION

1. Through years of hard work, 45 Spirits developed the opportunity of a lifetime. Through deceit, 47 Spirits and its principals—Zohair Sultan and Sameet Patel—stole it for themselves. 45 Spirits brings this action to recover its losses and 47 Spirits' ill-gotten gains.

2. Celebrity-branded alcohol is a big business: According to industry estimates, Americans spent $7 billion on vodka alone in 2025.[1] Celebrity spirit brands have established a significant place in the alcohol market. Bethenny Frankel was an early innovator; she developed

[1] *Spirits Market Maintains Share Lead, DISCUS Reports*, Beverage Indus. (Feb. 6, 2026), available at https://www.bevindustry.com/articles/98155-spirits-market-maintains-share-lead-discus-reports.

her “Skinnygirl Margarita” brand in 2009 and sold it for over $100 million in 2011, demonstrating the rapid scalability and substantial enterprise value achievable in the celebrity-driven spirits market.[2] Since then, numerous other celebrities have followed suit: George Clooney’s Casamigos tequila brand was sold for up to $1 billion in 2017[3]; UFC fighter Conor McGregor sold his majority share of Proper No. Twelve whiskey brand to spirits giant Proximo Spirits for $600 million in 2021;[4] Ryan Reynolds’ Aviation Gin sold for up to $610 million in 2020;[5] Sean Combs’s partnership with Ciroc caused the brand’s sales to increase from 50,000 cases per year to over 2 million[6]; Dwayne “The Rock” Johnson’s Teremana tequila brand set an industry record by selling over 600,000 cases in its first year full year in business (2021), and its valuation is now approximately $3.5 billion.[7]

3. Today, perhaps no celebrity is better known than Donald Trump. The President of the United States has more than 12.6 million followers on his own social media network, Truth

---

[2] Meghan Casserly, *Can Bethenny Crack a Billion?*, Forbes (May 18, 2011), available at https://www.forbes.com/2011/05/17/celebrity-100-11-bethenny-frankel-skinnygirl-bravo-money-makers.html.

[3] *See* Sarah Whitten, *George Clooney Just Sold His Tequila Business for up to $1 Billion*, CNBC (June 21, 2017), available at https://www.cnbc.com/2017/06/21/george-clooney-just-sold-his-tequila-business-for-1-billion.html?msockid=09ac90faa1ff693a020384fba06668d6.

[4] *See* Marc Raimondi, *Conor McGregor Sells Majority of Whiskey Brand Proper No. Twelve to Proximo Spirits for $600M*, ABC News (Apr. 27, 2021), available at https://abcnews.com/Sports/conor-mcgregor-sells-majority-whiskey-brand-proper-twelve/story?id=77350387.

[5] Aimee Picchi, *Ryan Reynolds’ Aviation Gin Sold to Diageo for up to $610 Million*, CBS News (Aug. 17, 2020), available at https://cbsnews.com/news/ryan-reynolds-aviation-american-gin-bought-diageo/.

[6] Rupert Neate, *Sean ‘Diddy’ Combs Buys Premium Tequila Brand DeLeon with Diageo*, The Guardian (Jan. 8, 2014), available at https://www.theguardian.com/business/2014/jan/08/sean-diddy-combs-buys-deleon-tequila-diageo.

[7] *See* Kate Malczewski, *The Rock’s Teremana Tequila Tops 600,000 Cases*, The Spirits Bus. (Dec. 21, 2021), available at https://www.thespiritsbusiness.com/2021/12/the-rocks-teremana-tequila-tops-600000-cases/; Jeannine Mancini, *Dwayne ‘The Rock’ Johnson Is Expected to Become a Billionaire from His Tequila Brand Valued at Around $3.5 Billion*, Yahoo! Finance (Feb. 1, 2024), available at https://finance.yahoo.com/news/dwayne-rock-johnson-expected-become-185923185.html.

Social, and over 111 million followers on X (formerly known as Twitter).[8] He is almost certainly one of the most well-known people in the world. Given his fame, a Trump-branded spirit has the opportunity to outperform the valuations achieved by less famous celebrities.

4. Attaching the Trump name to a spirits product had been tried before: A Trump-branded vodka was introduced in 2005 but failed by 2011. That failure has been attributed to a low-quality vodka, made overseas, and marketed to the ultra-luxury segment of the market.

5. But a lot has changed since 2011. Since then, Donald Trump has been twice elected President. He has amassed a large and loyal political following tens of millions strong. His family's recent business ventures have attracted large investments and found commercial success that earlier ventures hadn't. As a result, the "Trump" name has likely never been more valuable than it is today.

6. 45 Spirits had the opportunity to capitalize on Trump's ascendance by relaunching the failed "Trump Vodka" brand. One of its founders, Plaintiff Richard DeCicco, had spent more than 40 years building brands in the spirits industry. He spent nearly a decade as CEO of Harbor Industries, consulting with the world's largest liquor companies on some of the world's largest brands, including Malibu Rum, Bailey's Irish Cream, Goldschläger, and J&B Scotch. He has also helped numerous celebrities launch branded spirits. Rich had deep experience and connections across the spirits industry, from distilling, to packaging, to distribution, to marketing and sales.

7. After meeting Mr. DeCicco, President Trump agreed that he was uniquely well-suited to the task. After hearing Mr. DeCicco's vision at their first meeting in Mar-A-Lago,

---

[8] @realDonaldTrump, TruthSocial, available at https://truthsocial.com/@realDonaldTrump; @realDonaldTrump, X, available at https://x.com/realDonaldTrump.

President Trump shook Mr. DeCicco's hand and said, "Richard, you have a deal, and I guarantee you it's the biggest deal of your life."

8. Mr. DeCicco and his business partner, Plaintiff Timothy Klintworth, got to work on the relaunch. Mr. Klintworth is a successful intellectual property attorney in Chicago; through his connections, Mr. Klintworth had helped secure Mr. DeCicco's introduction to President Trump. Mr. Klintworth has decades of experience in licensing, intellectual property law, patent and trademark prosecution, product development, and copyrights. While Mr. DeCicco focused on the new business's operational and branding plans, Mr. Klintworth led negotiations with the Trump family, led by Eric Trump, to license the Trump name. Mr. Klintworth also led outside fundraising for the new business.

9. Over the next three years, Mr. DeCicco and Mr. Klintworth devoted thousands of hours to developing the business, including financial and technical information that would make the relaunched Trump Vodka plan a success, resulting in a fully developed, turnkey business ready for immediate execution upon closing. This information included operational and branding plans, bottle and packaging designs, pricing strategies, financial plans and projections, and the terms of the Trump licensing agreement. Mr. DeCicco and Mr. Klintworth developed all this information in close consultation with the Trump team, including Eric Trump, Kerry Woolard, the general manager of the Trump Winery, and Alan Garten, general counsel of the Trump Organization. Mr. DeCicco and Mr. Klintworth thus had unique insight into what it would take to make the partnership work. To protect their information and the opportunity it unlocked, Mr. DeCicco and Mr. Klintworth kept their plans secret, sharing them only with those who needed to know on a confidential basis.

10. While they were doing the hard work necessary to make the relaunch a success in 2023 and 2024, President Trump was convicted in New York, faced several indictments across the country, and throughout 2024 was locked in a fiercely competitive reelection campaign with Vice President Kamala Harris. Given these challenges, many of the potential investors Mr. Klintworth approached were afraid to invest in the future of the Trump brand.

11. But Mr. DeCicco and Mr. Klintworth persisted, and by late 2024, their company—Plaintiff 45 Spirits LLC—was primed to take off. That September, Mr. Klintworth had concluded arduous negotiations on the licensing agreement that would give 45 Spirits the right to use the Trump name. The last step was to finish raising the $7 million upfront licensing fee. And after President Trump won the election in November, the commitments from outside investors came pouring in.

12. By the following spring, 45 Spirits had raised over $12 million from outside investors—more than enough to pay the licensing fee and begin operations. The outside investors signed their funding commitments for 45 Spirits at a $50 million post-money valuation, on the basis of the detailed financial projections 45 Spirits developed with the benefit of Mr. DeCicco's decades of industry experience. Using a discounted cash flow valuation method, those projections imply an economic value of 45 Spirits of approximately $300 million as of June 1, 2025. 45 Spirits and its founders, Mr. DeCicco and Mr. Klintworth, were poised to cash in on the opportunity their hard work had earned them.

13. On June 4, 2025, as Mr. Klintworth was preparing an email to schedule the closing with the Trump team, he received a call from the Trump Organization's general counsel, Alan Garten. Mr. Garten told Mr. Klintworth that the licensing deal was off, and that Eric Trump had chosen to partner with a different group.

14. The rival group was led by the Defendants: 47 Spirits, its founder, Sameet ("Sam") Patel, and his business partner, Zohair ("Zee") Sultan. By lying, cheating, and stealing, Defendants wrested away the Trump Vodka opportunity from 45 Spirits.

15. Sultan had been friends with Mr. Klintworth for years. Mr. Klintworth first approached Sultan about investing in 45 Spirits in December 2024, during the company's final fundraising push. Sultan promised to keep confidential the information Mr. Klintworth shared about 45 Spirits. After securing that promise, Mr. Klintworth shared with Sultan the business and marketing plans, bottle designs, financial projections, and the confidential terms of the final licensing agreement with the Trumps, among other information, thereby providing access to a fully developed turnkey business. Sultan then introduced his friend, Patel, to Mr. Klintworth and Mr. DeCicco, and Patel too promised to keep 45 Spirits' information confidential; additionally, both promised to sign NDAs regarding that information. Sultan and Patel made the same promise to sign NDAs on a call held the following day.

16. Sultan and Patel did not keep their promises. Instead, they decided to take the Trump Vodka opportunity for themselves, and to do so by using the same information they promised to keep secret and use only to explore investing in 45 Spirits.

17. Sultan and Patel carried out their theft with deceit. On May 13, 2025, Sultan reached out to Mr. Klintworth after months of silence, claiming to still be interested in investing in 45 Spirits. In a series of texts and phone calls between May 13 and June 1, Sultan pressed Mr. Klintworth for details about 45 Spirits' fundraising and the timing of closing the deal with the Trumps. Sultan's pretended interest was among the reasons Mr. Klintworth delayed closing 45 Spirits' deal with the Trumps and its already-committed investors.

18. On information and belief, delay was Sultan's intention. Because what Mr. Klintworth didn't know was that while Sultan was "pumping" him for this additional information, Sultan's business partner, Patel, was setting up a copy-cat business to execute on 45 Spirits' proprietary plans. On May 20, in the midst of Sultan's information-extraction campaign, a company named "47 Spirits LLC"—virtually identical to Mr. DeCicco and Mr. Klintworth's business, 45 Spirits LLC—was organized under Delaware law. Later events revealed that Patel was the organizer.

19. Sultan and Patel then used 47 Spirits as a vehicle to usurp 45 Spirits' opportunity, misusing 45 Spirits' proprietary information to appropriate a fully developed turnkey business, including copy-cat business plans, bottle designs, and licensing terms, and to present that business to the Trumps. Even the name of their business was ripped off. Sultan and Patel have no background in the spirits business and could not have recreated 45 Spirits' proprietary plans—or the turnkey business those plans comprised—from scratch if they had tried. In fact, it appears that the only thing that 47 Spirits brought to the table that they didn't steal directly from 45 Spirits was an offer to pay the Trumps $3 million more upfront than 45 Spirits had negotiated to pay. But even that offer would not have been possible without Sultan and Patel's misuse of 45 Spirits' confidential licensing terms, which told Sultan and Patel how much 45 Spirits was paying and how much it would take to "outbid" them. Thus, 47 Spirits' entire business is built on Sultan's and Patel's theft, broken promises, and deceit.

20. Today, Defendants are enjoying the success of the business they stole. The relaunched Trump Vodka website reflects that the brand is already available for purchase in stores in Illinois, Florida, Arizona, California, and Washington; and is available for shipping across the United States. Based on Trump Vodka's social media posts, the brand will be on sale imminently

in stores in Louisiana, Michigan, Idaho, Virginia, Texas, Colorado, New York, Iowa, and Panama City; and soon will be available for purchase in stores across the entire country as well as internationally. In the words of 47 Spirits' president, Nick Arenas, "within the next six months, [Trump Vodka] will be in 40 plus states, live within those locations."[9] Trump Vodka's social media posts further demonstrate that the Trump Hotel and Tower in Chicago offers Trump Vodka to patrons, while the brand is promoted at numerous events hosted by the Trump Organization. This increasing availability has led to "a lot of sales": Arenas recently estimated that within 18 months, the Trump Vodka brand will be worth "north of about $500 million to between $500 million and a billion."[10] In the midst of this roll-out, Sultan and Patel are flaunting their stolen wealth on social media, posing as the "masterminds" behind Trump Vodka. In truth, the only thing they masterminded was a plot to steal the Plaintiffs' intellectual property and business opportunity.

21. Meanwhile, 45 Spirits, Mr. DeCicco, and Mr. Klintworth have nothing, despite investing years of work and applying decades of expertise to develop a fully operational, turnkey business that led to Trump Vodka's successful relaunch today. In the end, Defendants' unlawful conduct deprived Plaintiffs of a business worth hundreds of millions of dollars. This action seeks to right that wrong.

## JURISDICTION AND VENUE

22. 45 Spirits brings claims under the federal Defend Trade Secrets Act ("DTSA") and Copyright Act. The Court has original jurisdiction over those claims under 28 U.S.C. § 1331, 18 U.S.C. § 1836(b)(1) and (c), and 28 U.S.C. § 1338(a).

---

[9] Invest Well Show, *Inside the Billion-Dollar Celebrity Liquor Brand Industry w/ Trump Vodka's Nick Arenas* (Spotify May 7, 2026), available at https://open.spotify.com/episode/2IZLW3W5DpmyL0psGtLfmn?si=yweCA9_qQDa6CP1_h_CUJw&nd=1&dlsi=d56f55c9848648e3.

[10] *Id.*

23. This suit also asserts claims arising under state common law. The Court has supplemental jurisdiction over those claims under 28 U.S.C. § 1367(a) because those claims are so related to 45 Spirits' federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

24. Personal jurisdiction is proper in this District because each Defendant has purposefully and voluntarily directed their activities toward the State of Illinois such that each should expect, by virtue of the benefits received, to be subject to this Court's jurisdiction. Defendants have purposefully availed themselves of the laws of Illinois by, among other things: continuous and systematic contacts with the state of Illinois, purposefully directing communications to an Illinois-based Plaintiff over a sustained period of time; entering into an agreement with an Illinois-based Plaintiff; committing tortious acts in and directed to Illinois; infringing the copyrights of an Illinois-based copyright owner; and advertising and selling infringing products in Illinois stores and online into Illinois.

25. Venue is proper over Defendants Sultan, Patel, 47 Spirits LLC, 47 Spirits Holdings LLC, and 47 Spirits MGR LLC in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Illinois, as detailed below. Venue is also proper in this District under 28 U.S.C. § 1391(c)(2) for Defendants 47 Spirits LLC, 47 Spirits Holdings LLC, and 47 Spirits Holdings MGR LLC because this Court has personal jurisdiction over these Defendants.

## PARTIES

26. Plaintiff 45 Spirits LLC is a limited liability company organized under the laws of Delaware on May 4, 2023, with a principal place of business in New York and an office in Chicago. 45 Spirits is owned by Red Kingdom, LLC, a Wyoming limited liability company, and R&R Spirits, LLC, a Wyoming limited liability company.

27. Plaintiff Richard DeCicco resides in Florida. Mr. DeCicco is a nearly 50-year veteran of the alcoholic beverage industry. Before founding 45 Spirits, Mr. DeCicco served as the President of Harbrew Imports, Ltd., and as CEO of Harbor Industries. Mr. DeCicco is a recognized leader in alcohol brand development and a pioneer of "value added packaging" within the alcoholic beverage industry. R&R Spirits, LLC, is wholly owned by Mr. DeCicco.

28. Plaintiff Timothy Klintworth resides and works in Illinois. Mr. Klintworth is a successful intellectual property attorney and a co-founder of Klintworth & Rozenblat LLP. Mr. Klintworth has decades of experience in intellectual property law, including portfolio management, patent and trademark prosecution, copyright, and negotiating and drafting license agreements. Red Kingdom, LLC, is wholly owned by Mr. Klintworth.

29. On information and belief, Defendant Zohair "Zee" Sultan currently resides in Florida, but has owned properties in Illinois during the events described in this Complaint. He describes himself online as a "serial entrepreneur." On information and belief, he is a managing partner at L.A. Tan Corporate, which is based in Lincolnwood, Illinois, and operates Sultan Consulting Corporation, an Illinois company with its principal address in Lombard, Illinois. Until its July 11, 2025 dissolution, Sultan was a member of Outset Worldwide, LLC, located in Bartlett, Illinois. Sultan has been the registered agent of other Illinois-based corporations.

30. On information and belief, Defendant Sameet "Sam" Patel resides in Florida and owns or operates businesses based in Mississippi. On his LinkedIn profile, he describes himself as a "Founder" of 47 Spirits. On information and belief, Mr. Patel operates numerous companies affiliated with Onyx Hospitality, LLC, from 5740 Getwell Road, Southhaven, MS 38672.

31. Defendant 47 Spirits LLC was organized under the laws of Delaware on May 20, 2025, according to public records maintained by the state of Delaware. On information and belief, 47 Spirits LLC is operated from 5740 Getwell Road #5D, Southaven, MS 38672.

32. Defendant 47 Spirits Holdings LLC was organized under the laws of Delaware on July 7, 2025, according to public records maintained by the state of Delaware. On information and belief, 47 Spirits Holdings LLC is operated from 5740 Getwell Road #5D, Southaven, MS 38672.

33. Defendant 47 Spirits Holdings MGR LLC was organized under the laws of Delaware on July 29, 2025, according to public records maintained by the state of Delaware. On information and belief, 47 Spirits Holdings MGR LLC is operated from 5740 Getwell Road #5D, Southaven, MS 38672.

## FACTS

### I. 45 Spirits Develops Valuable Intellectual Property and Business Expectancies.

34. Over the course of over three years, from 2022 to 2025, Mr. DeCicco and Mr. Klintworth devoted thousands of hours to developing proprietary business, production, distribution, and marketing plans and designs to bring the "Trump Vodka" brand back to market through the business entity they founded in May 2023, 45 Spirits LLC.

35. The Trump Vodka brand originally launched in 2005 but ceased production in 2011. According to a 2016 Bloomberg retrospective, the original "Trump Vodka had problems, from distillery to bottling to finance."[11] The vodka was made in the Netherlands by a struggling distiller, and its bottles were produced in Europe, then in China. It was priced at the super-premium level,

[11] *See* Max Abelson, *On the Rocks: The Story of Trump Vodka*, Bloomberg News (Apr. 20, 2016), available at https://www.bloomberg.com/features/2016-trump-vodka/.

which was about $30 more per bottle than popular brands like Absolut, Svedka, or Smirnoff; and it was marketed as a luxury brand tied to Trump's gold-plated image:




36. But the vodka wasn't very good, especially for its price point, and the brand didn't catch on. Sales dropped, the bank pulled the company's credit, and the brand entered a death spiral. Vendors went unpaid, lawsuits followed, and production ground to a halt by 2011. Ultimately, one observer concluded, the original Trump Vodka failed because Trump "chose to do a deal with people who didn't have the money or experience behind them to win."[12]

37. To avoid the mistakes that led to Trump Vodka's prior failure, President Trump turned to Mr. DeCicco. As noted, Mr. DeCicco has almost five decades of experience taking liquor brands from their infancy to putting the bottle on the shelves, and all steps in between. He has extensive relationships with distillers, packaging suppliers, and distributors across the U.S. and

---

[12] *Id.*

abroad. He has leveraged that experience to become an industry leading consultant, advising celebrities on the logistics and marketing involved in launching a liquor brand, including his current brand partner Christie Brinkley as well as many other celebrities.

38. Mr. DeCicco learned about the Trump Vodka opportunity from a mutual acquaintance of his and Mr. Klintworth, who connected the two of them in January 2022. Mr. Klintworth is a named partner in a successful law firm in Chicago. He used his network to arrange a meeting between Mr. DeCicco and Mr. Trump in May 2022, at the President's Mar-a-Lago resort.

39. The meeting went forward on May 20, 2022. Mr. DeCicco attended with his partner, Roseann Faltings, and Mr. Klintworth, and others. Mr. DeCicco shared his vision for the revived brand with President Trump, which included an entirely made-in-America approach for the distilling, bottling, and packaging; patriotic themes in bottle design and marketing; and a price point broadly accessible to the President's thirty-million-plus voter base. In each respect, Mr. DeCicco's vision reversed the approaches that contributed to failure of the original Trump Vodka brand.

40. President Trump must have liked what he heard, because when Mr. DeCicco had finished sharing his vision for the brand, the President shook his hand and said: "Richard, you have a deal, and I guarantee you it's the biggest deal of your life."




(*Richard DeCicco, second from left; Tim Klintworth, second from right*)

41. Together, Mr. DeCicco and Mr. Klintworth got to work developing the operational, marketing, licensing, and financing plans necessary to make Mr. DeCicco's vision a reality. By May 2023, they had formed 45 Spirits LLC as the vehicle for the business.

42. The operational and marketing plans 45 Spirits developed were built on Mr. DeCicco's decades of industry experience and know-how. They included sourcing strategies based on Mr. DeCicco's deep knowledge of distillers in the United States and abroad. They included distribution and retail strategies, also based on Mr. DeCicco's industry knowledge and relationships. They also included pricing and branding strategies meant to appeal to fans of President Trump, which drew on Mr. DeCicco's long and successful experience finding a market for successful liquor brands, including celebrity brands. They included labels for bottles, taglines, and plans for promotional events and sponsors. They also added evaluations of competitors and the market for vodka products, as well as marketing strategies, including event sponsorships, social media, television advertisements, point of sale displays, and various advertising campaigns.

45 Spirits' operational and marketing plans took Mr. DeCicco, a nearly 50-year industry veteran, years to complete; they could not have been readily ascertained even by someone as seasoned and skilled as Mr. DeCicco, let alone an amateur in the field.

43. In addition to its operational and marketing plans, 45 Spirits also developed plans for licensing the Trump name and raising capital to fund payment for the license and operations. Mr. Klintworth led the licensing negotiations with the Trump team. The licensing negotiations were arduous, with the parties exchanging innumerable drafts and revisions of the licensing agreement. By September 2024, after more than two years of negotiations, that hard work had paid off.

44. On September 4, Adam Rosen, EVP and Assistant General Counsel for the Trump Organization, emailed Mr. Klintworth, attaching what he called the "'final' version," and told Mr. Klintworth that "[y]ou can tell your investors that we would be willing to proceed" with that version. This Licensing Agreement showed the Trump Organization's interest in the vision for Trump Vodka that Mr. DeCicco and Mr. Klintworth created, as the Trump Organization insisted on a clause requiring Mr. DeCicco to be the Chief Executive Officer of 45 Spirits during the Agreement's term. The "final" terms of the 45 Spirits Licensing Agreement were themselves valuable, because without them, a third party would not have known what it would take to obtain the Trump license.

45. All that was left to do was to pay the amount due on the License Agreement's execution—a $7 million upfront royalty—and to sign.

46. Mr. Klintworth also led 45 Spirits' fundraising efforts. Those efforts were especially challenging in 2023 and 2024 (at least until Election Day). For one, the Trumps, like 45 Spirits, wanted to keep the relaunch highly confidential and carefully limit investor outreach to

avoid leaks. The Trumps were also eager to avoid investors with any past legal or regulatory trouble, given the legal scrutiny President Trump was facing at that time. Meanwhile, many potential investors were wary of going into business with the Trumps, because of that same legal scrutiny.

47. Despite these challenges, Mr. Klintworth ultimately succeeded in raising $12.25 million from a group of six outside investors by June 2025. Those investors, and the other potential investors 45 Spirits approached, agreed to keep confidential all information they learned about 45 Spirits or its business to conduct investment due diligence.

48. Among the materials 45 Spirits used to successfully solicit investors were projections of 45 Spirits' financial performance. 45 Spirits developed those financial projections over nearly two years. They include specific inventory, pricing, marketing, sales, margin, profit, and other expense calculations to project revenue and expenses year-over-year and financial statements for the (intended) first year of 45 Spirits' operations. Mr. DeCicco's operational experience made these projections reliable, and the outside investors who signed up to fund 45 Spirits relied on them to make their investment commitments, at a $50 million post-money valuation for 45 Spirits' equity.

49. 45 Spirits developed its proprietary business, marketing, licensing and financing plans in close and ongoing consultation with the Trump Organization, the family-owned conglomerate operated by President Donald J. Trump's eldest sons, Eric and Donald Trump. Early on in the collaboration, President Trump sat with Mr. DeCicco and Ms. Faltings in Bedminster, New Jersey, for an hour, reviewing and commenting on bottle designs and marketing elements. Mr. DeCicco's and Mr. Klintworth's efforts resulted in a strategy and set of designs that was tailor-made to further their brand vision in a manner that accounted for the Trumps' concerns and

specifications. Outside parties could not easily learn or replicate this unique brand without the inside access 45 Spirits' relationship and years of work had fostered.

50. Specifics regarding the new Trump Vodka brand identity remained to be ironed out. Thus, for more than a year, Mr. DeCicco drew on his considerable expertise to advocate in meetings and calls for a patriotic, made-in-America theme for the brand, rather than the "luxury" branding associated with the (failed) first iteration of the Trump Vodka brand. Mr. DeCicco's advocacy eventually overcame substantial resistance from elements within the Trump Organization that pushed for a luxury brand identity similar to the first, failed Trump Vodka product. Overcoming the resistance to the new, patriotic and accessible branding, Mr. DeCicco, Mr. Klintworth, and their counterparties at the Trump Organization agreed on finalized license terms in September 2024 and continued to refine the brand identity in winter and spring of 2025.

51. To preserve the value of these plans, and the business opportunity they unlocked, 45 Spirits took reasonable steps to keep its proprietary information confidential. 45 Spirits required outside parties, including prospective investors, to agree to keep 45 Spirits' information confidential. 45 Spirits took care to identify its proprietary information as "confidential," through markings on the documents themselves, or by identifying them as "confidential" when they were transmitted. 45 Spirits avoided discussing its plans publicly and kept tight the circle of potential investors or partners it approached. Investors signed non-disclosure agreements to further protect the secrecy of 45 Spirits' proprietary information. 45 Spirits knew it was sitting on a goldmine and was careful to avoid outside parties usurping the opportunity it had worked so hard to develop.

52. By May 2025, 45 Spirits had the "final" Licensing Agreement in hand and had raised more than enough to pay the $7 million upfront licensing fee and launch operations. All that was left to do was close on the Licensing Agreement and funding commitments, which

Mr. Klintworth was in the process of scheduling in early June. After years of hard work, 45 Spirits' business was ready to take off.

## II. Under False Pretenses, 47 Spirits Steals 45 Spirits' Proprietary Information.

53. Unfortunately for 45 Spirits, however, Defendants' crooked scheme to steal 45 Spirits' proprietary information and business opportunity was also well underway.

### A. 45 Spirits Shares Its Information with Sultan and Patel in Confidence.

54. For years, Zohair "Zee" Sultan had been a friend of Mr. Klintworth. Sultan had attended Mr. Klintworth's 50th birthday party in Chicago, his former girlfriend was a friend of Mr. Klintworth's wife, and Sultan and his former girlfriend had visited Mr. Klintworth at his Chicago home. Mr. Klintworth also knew Sultan to be an investor in various ventures.

55. In December 2024, Mr. Klintworth approached Sultan as a friend, offering him an opportunity to invest in 45 Spirits at the ground floor. Before sharing 45 Spirits' confidential materials, Mr. Klintworth secured Sultan's promise that he would maintain the information in strict confidence and would not use or disclose it for any purpose other than to evaluate a potential investment. Sultan provided these promises during a telephone call that Mr. Klintworth had from his Chicago office on December 12, 2024.

56. Later that day, Mr. Klintworth transmitted 45 Spirits' "investor package" of documents to Sultan via email. The subject line identified these materials as "confidential," and Mr. Klintworth's email specified that they could be shared only "confidentially." The attachments included: (1) art for a Trump Vodka bottle label; (2) a detailed business plan and "pitch deck"; (3) an investment term sheet; (4) the "final" License Agreement, reflected the terms 45 Spirits had developed with the Trump Organization team; and (5) 45 Spirits' detailed financial projections. The financial projections contained a cover sheet noting that the "reader agrees to the provisions set forth" on the "Disclaimers" page of Finalis.com, which were incorporated by reference. Those

provisions state that the "document and its contents are confidential to the person(s) to whom they are delivered and should not be copied or distributed . . . to any other person." The provisions further state that the information in the financial projections is "confidential and is provided for the exclusive use of the recipient and may not be reproduced, provided or disclosed to others, or used for any other purpose, without authorization."[13]

57. Later on December 12, Sultan texted Mr. Klintworth in Illinois to introduce him to his friend, Sameet "Sam" Patel, whom Mr. Klintworth understood to be another person with investment experience. Sultan and Patel called Mr. Klintworth at his Chicago home office. On that call, they again promised to keep the information Mr. Klintworth had sent to Sultan confidential. Both Sultan and Patel also promised to sign NDAs.

58. The next day, Mr. Klintworth organized a call with himself, Mr. DeCicco, Sultan, and Patel. Sultan called Mr. Klintworth's home office in Chicago. With Mr. DeCicco and Patel on the line, both Sultan and Patel again promised they would keep confidential the information Mr. Klintworth shared on behalf of 45 Spirits. The four discussed the terms of a potential investment by Sultan and Patel for about 20 minutes. Sultan and Patel again promised to sign NDAs.

59. The proprietary information 45 Spirits shared with Sultan and Patel reflected the years of expertise and hard work that Mr. DeCicco and Mr. Klintworth had invested. For example, the financial projections Mr. Klintworth sent included detailed assumptions including pricing at the wholesale, retail, and customer level, which include projected increases to cost-of-goods sold and wholesaler pricing figures; costs of acquiring inventory over time; revenue from sales and

---

[13] *Disclaimers*, Finalis (last accessed Apr. 17, 2026), available at: https://www.finalis.com/members/disclaimers.

sales forecasts; marketing costs, including compensation paid to potential celebrity endorsers; other operating expenses, including alcoholic beverage licensing requirements, facilities, promotion, legal, insurance, and other compliance costs; salaries for executives and staff; and distributions to investors. Given the amount of detail, they also provide insight into 45 Spirits' proprietary operational plans and a means to "reverse engineer" those plans.

60. Likewise, the term sheet Mr. Klintworth sent detailed how 45 Spirits intended to use investor capital, the royalty percentage to be paid for the Trump license, management salaries, distribution terms, and governance information. The "pitch deck" detailed 45 Spirits brand and marketing strategy, and compiled industry data concerning valuations for other celebrity-driven spirits brands, comparable sales of other vodka ventures, target distributors and retailers, growth projections, bottle designs, and marketing plans. Much of the information in the "pitch deck" was based on Mr. DeCicco's nearly 50 years of experience in the liquor industry, could not be readily ascertained from publicly available data alone, and was a unique compilation of marketing, branding, pricing, and advertising strategies that drew value from not being generally known by others. And the final Licensing Agreement between 45 Spirits and the Trumps reflected the confidential license terms negotiated between Mr. DeCicco, Mr. Klintworth, and the Trump Organization over a period of years and the amounts 45 Spirits agreed to pay the Trumps upfront and in the future—invaluable information for a potential competitor seeking to "outbid" 45 Spirits for the Trump Vodka opportunity.

61. In January 2025, media began to report on the potential revival of a Trump vodka product; those reports did not, however, reflect the proprietary information that Mr. Klintworth had shared with Sultan and Patel. Sultan saw these media reports and shared them with Mr. Klintworth. To avoid Sultan viewing this reporting as a sign that 45 Spirits' proprietary

information was no longer confidential, Mr. Klintworth sent Sultan a text message again seeking Sultan's assurances that he would preserve confidentiality over that information. Sultan texted back Mr. Klintworth agreeing to do so, consistent with their previous oral agreement.

**B. Sultan and Patel Form 47 Spirits to Steal 45 Spirits' Information.**

62. Sultan and Patel were not satisfied with an opportunity to invest in 45 Spirits at a ground-floor valuation, however. Instead, in violation of their duty to keep 45 Spirits' proprietary information confidential, Sultan and Patel decided to steal the business plans, licensing information, and proprietary designs for themselves.

63. On May 13, 2025, after months of silence, Sultan texted Mr. Klintworth (in Illinois) to ask if there was still room to invest in 45 Spirits, claiming to be interested in investing millions of dollars. He told Mr. Klintworth he was "selling a couple properties and wanted to see if you could still have room inside of that vodka deal," and claimed he "got a couple million free up and I'd be interested to see what that would get me." Mr. Klintworth told Sultan that 45 Spirits was trying to close the deal by May 16, to which Sultan responded that he had "some properties selling towards the end of the month" and didn't "think [he could] move that quick."

64. To make room in the deal for his friend, and because Sultan's expressed interest gave Mr. Klintworth an opportunity to close with more cash on hand, Mr. Klintworth held off on scheduling closing with the Trumps.

65. Over the next three weeks, through the beginning of June 2025, Sultan and Mr. Klintworth exchanged texts and had multiple phone calls. Sultan directed call after call and text after text to Mr. Klintworth in Chicago. On those calls and in those texts, Sultan pretended that he and Patel had assembled a group that was interested in investing several million dollars for minority equity stakes in 45 Spirits, and he repeatedly solicited additional confidential information about the deal.

66. On May 22, 2025, Sultan and Mr. Klintworth spoke on the phone. During their approximately 33-minute call, Sultan reaffirmed his and Patel's commitment to keep all information about 45 Spirits confidential, and stated that he, Patel, and any other investors would sign a non-disclosure agreement. As noted, by this time, Mr. Klintworth and Mr. DeCicco had raised enough capital to close the Licensing Agreement with the Trumps. For that reason, Mr. Klintworth told Sultan that he "could immediately close" the deal with the Trumps if Sultan and Patel sent letters of intent to invest $3–4 million. Sultan said he would get back to Mr. Klintworth the following day.

67. On May 26, 2025, Sultan responded to Mr. Klintworth, "Sorry for the delay to give you an update on my funds and sale of my properties. I am receiving approx $1.8m from my sale and like I mentioned I need to reinvest it. The escrow funds have gone hard and they are past their due diligence. Closing is set for June 19th." The same day, Sultan said he had the "possibility of getting 4-5m in LOIs this week."

68. Sultan then sent a list of questions to Mr. Klintworth about the potential investment allegedly from the investor group Sultan claimed to have assembled. Sultan sought confidential information concerning the deal's equity structure, the timing of production, and the date of the anticipated closing with The Trump Organization's licensing entity. Mr. Klintworth, relying on his friend's promise of continued confidentiality, shared the information Sultan requested on the express understanding that it would be used to advance an investment by Sultan's and Patel's group in 45 Spirits, and not for any other purpose.

69. Throughout this time, Mr. Klintworth repeatedly asked Sultan to sign the non-disclosure agreement. Sultan dodged these requests, telling Mr. Klintworth that he would "get right on" signing it, or saying that he would sign it later: "OK bro, give me just a bit."

70. Unbeknownst to Mr. Klintworth, however, and in the midst of Sultan's barrage of questions throughout May 2025, an entity called "47 Spirits LLC" was organized on May 20, 2025 under Delaware law. Based on later events detailed below, it is clear that Patel set up 47 Spirits as the vehicle to receive the proprietary information that Sultan, Patel's "business partner," was at the same time cynically "pumping" out of Mr. Klintworth, to whom Sultan continued to hold himself out as a true friend.

## III. 47 Spirits Steals 45 Spirits' Business Opportunity.

71. By early June, after obtaining more of 45 Spirits' confidential information, Sultan abruptly ceased communication with Mr. Klintworth. The two have not spoken since.

72. Then, on June 4, Alan Garten, the Trump Organization's General Counsel, called Mr. Klintworth to tell him that Eric Trump was calling off the deal with 45 Spirits and partnering with another group instead. With that call, 45 Spirits lost years of hard work by its founders and a business opportunity then worth multiples of the initial $50 million valuation that had been the basis for 45 Spirits' successful fundraising campaign.

73. Over the following months, it became clear that Sultan and Patel led the group that covertly usurped 45 Spirits' Trump Vodka opportunity, and that they did so using 45 Spirits' proprietary information.

74. On August 11, 2025, an industry consultant contacted Mr. DeCicco and told him that Sultan and Patel had held a Zoom call with Liquid Rails, a national beverage distribution company, to discuss re-launching the Trump Vodka brand. The consultant reached out to Mr. DeCicco because he knew that Mr. DeCicco had spent years spearheading the re-launch.

75. Also in August 2025, another industry consultant reached out to Mr. DeCicco, telling him that Sultan and Patel were telling distributors that they had paid a $10,000,000 upfront licensing fee for the Trump Vodka deal—$3,000,000 more than the $7,000,000 upfront fee that

Sultan and Patel had learned in confidence that 45 Spirits had agreed to pay. The amount Sultan and Patel agreed to pay for the Trump Vodka deal further confirms their misuse of 45 Spirits' confidential information, including the terms of the License Agreement. Without that non-public information, which both 45 Spirits and the Trumps had agreed to keep confidential, Sultan and Patel could not have known the amount necessary to secure the license or how to structure a competing proposal capable of displacing 45 Spirits' carefully negotiated deal.

76. A third consultant reached out to Mr. DeCicco and sent pictures of the bottle designs that Sultan and Patel presented to investors. At the time, Trump Vodka website's landing page also displayed those same bottle designs. These pictures further confirm their misuse of 45 Spirits' intellectual property and show independent wrongs.

77. The images below compare 45 Spirits' March 2025 label and April 2025 bottle designs with the bottle design Sultan and Patel presented to distributors and vendors in August and to the final Trump Vodka bottle design announced in November 2025:

**45 Spirits**
(March 2025)




**45 Spirits**
(April 2025)




**Sultan/Patel**
(August 2025)




**Sultan/Patel**
(November 2025)




78. These images make clear that Sultan and Patel shamelessly copied key elements of 45 Spirits' designs, including its gold Vodka logo, the gold Eagle holding an American flag in its talons, and the taglines.

79. The similarities in the bottle designs extend to the back of the bottle. As one example, the description on the back of 45 Spirits' March 2025 bottle stated: "From the American Heartland to Your Home," while 47 Spirits' November 2025 bottle design derivatively suggests the vodka's origins in "the fields of America's heartland."

80. On August 19, 2025, once it was clear what happened, counsel for 45 Spirits sent Sultan and Patel a letter to complain and demand compensation for their illegal conduct. Sultan

and Patel responded by making minor modifications to the bottle design in a transparent attempt to cover their tracks, but they kept misusing 45 Spirits' intellectual property. For example, as pictured above, the bottle design Sultan and Patel showed potential investors in early August 2025 bore the tagline "The Spirit of America," a direct copy of the tagline Mr. Klintworth shared with Sultan in December 2024. By November—after 45 Spirits' demand letter—Sultan and Patel changed the tagline with the derivative phrase "The Great American Spirit."

81. This change was revealed on November 28, 2025, when the Trump Vodka Instagram account announced that the "pre-sale is now LIVE." The accompanying post displayed a picture of the bottle design incorporating the same core branding elements developed by 45 Spirits, including the eagle-and-flag motif, with the derivative tagline, "The Great American Spirit." The same day, Eric Trump posted a similar announcement in a video on Instagram. In the video, Eric prominently displayed the bottle design, showed a picture of Eric standing next to Patel and others associated with 47 Spirits – all holding Trump Vodka bottles, and stated: "Hi everybody, Eric Trump. We're doing Trump Vodka and it's gonna be the greatest vodka anywhere. We're making it here in the United States. We're making the bottle here in the United States. It's going to be a lot of fun to do. And so we're so excited to launch this new brand. We've got the largest winery east of the Mississippi in the US and this is just going to be another product offering. So we're incredibly excited about it. I can't tell you how much time was spent designing the bottle. Go to TrumpVodka.com." The video then provided a QR code with a link to TrumpVodka.com allowing Eric's followers to "ORDER NOW."

82. The Trump Vodka website confirms that Sultan and Patel stole 45 Spirits' intellectual property. The website displays the patriotic, made-in-America themes for which Mr. DeCicco and Mr. Klintworth spent more than a year advocating, rather than the more "luxury"

theme associated with the (failed) first Trump Vodka brand and initially favored by elements within the Trump Organization.

83. Specifically, the Trump Vodka website shows a farmer walking among cornfields and a solider waving an American flag. The "About" page says Trump Vodka was "[b]orn from the rich landscapes of America's heartland," and uses descriptors like "pride and ambition," "dedication," "courage," "relentless pursuit of greatness," "strive for excellence," and "celebration freedom and opportunity." These themes—and in some instances, these words—were contained in 45 Spirits' pitch deck and March 2025 bottle description.

84. The Trump Vodka webpage also confirms that Sultan and Patel stole 45 Spirits' business opportunity. A notice in small type at the bottom of the Trump Vodka webpage identifies the licensee of the "Trump" mark as "47 Spirits LLC." This is the same entity apparently organized by Patel in May 2025, at the same time Sultan was dishonestly delaying 45 Spirits' work to close the deal with the Trumps by reaching out to Mr. Klintworth under the guise of a would-be investor. In July 2025, Patel also organized Defendants 47 Spirits Holdings LLC and 47 Spirits Holdings MGR LLC. Today, Patel presents himself online as a "Founder" of 47 Spirits.

85. A recent interview confirms 47 Spirits stole 45 Spirits' business plan. In a podcast released on May 7. 2026, Nick Arenas, 47 Spirits' president, and Michael Wall, a wealth manager and investor involved in 47 Spirits' capital raise, noted their business strategy involved selecting an affordable price point for President Trump's "blue collar" base, emphasizing patriotic themes, and "making sure that [Trump Vodka is] American made"[14]—all elements of 45 Spirits' business plan. According to Arenas, "the corn that goes into making this comes from Missouri and Kentucky," a strategy 45 Spirits developed, as stated on its March 2025 bottle: "Trump Vodka is

---

[14] Invest Well Show, *supra* note 9.

born from 100% High Quality American Corn." 45 Spirits, then, created the business plan that has translated to "a lot of sales" of Trump Vodka.

86. Sultan and Patel, through their own social media and reposting others' content, have fostered the false impression that they are the "masterminds" behind Trump Vodka:




87. But the only thing these two "masterminded" was a dishonest scheme to lie, cheat and steal their way to riches that by right belonged to Plaintiffs. They recognized that the opportunity 45 Spirits developed was enormously valuable, and later events proved them right. On November 20, 2025, yet another alcohol industry veteran reached out to Mr. DeCicco and

informed him that Patel was raising $25,000,000 for 47 Spirits at a $100,000,000 valuation. Plaintiffs have since learned that Wall, who is close to the Trumps, assisted Patel with this capital raise. On November 28, presales of Trump Vodka began. Since then, it has been promoted at industry events and on social media, including by Eric Trump, who said "We're so excited about it, I can't tell you how much time was spent designing the bottle." Throughout December, 47 Spirits hosted numerous events at which Trump Vodka was sold, providing opportunities for advertising the new Trump Vodka brand. The Trump Vodka brand has garnered the attention of the press: Jimmy Fallon joked about it on The Tonight Show, causing pre-orders to spike. On December 21, the Trump Vodka Instagram announced that it had begun shipping orders.

88. In the months since, Trump Vodka is now available in stores in several states, including Illinois, and online nation-wide. Trump Vodka's social media pages have announced that it is coming to stores all over the country and expanding internationally. Now, Trump Vodka is "pushing to all 50" states and "11 countries" are "wanting to bring in [the] product."[15] According to Arenas, 47 Spirits has already "seen a lot of sales" of Trump Vodka bottles through its online platform and shipped them across the country.[16] On information and belief, Illinois residents have purchased Trump Vodka bottles online and in stores in Illinois. The business 45 Spirits spent years building has taken off, but only after 47 Spirits stole it from its true owners.

## IV. 47 Spirits' Theft Severely Injures 45 Spirits, While Unjustly Enriching 47 Spirits.

89. 45 Spirits' losses—and 47 Spirits' unjust enrichment from its theft—are substantial. Even before it launched, 45 Spirits successfully raised over $12 million at a present valuation of $50 million. Within months, 47 Spirits was raising outside capital at a $100 million valuation,

[15] *Id.*
[16] *Id.*

using the same plans and designs it had stolen from 45 Spirits. Now, Arenas and Wall predict 47 Spirits' copycat business will be worth over $500 million in 18 months, and over $1 billion within 2 and a half years.[17]

90. Using 45 Spirits' discounted cash flow projections of U.S. sales only—on the basis of which it had successfully raised millions in outside capital—and reasonable economic assumptions, 45 Spirits' business was reasonably worth at least approximately $300 million dollars on the date that its business was destroyed by Defendants' unlawful misappropriation and tortious interference. Based on the domestic and international success of other celebrity brands, 45 Spirits could have easily been worth a billion dollars or more within a few years.

91. In addition to the value that 45 Spirits lost, Defendants have been unjustly enriched by their illegal conduct. Sultan and Patel have no meaningful experience in the spirits business. They did not put in the years of hard work necessary to develop the information and plans underlying the Trump Vodka relaunch; as rank amateurs in the spirits business and "serial entrepreneurs," they could not have developed a viable business and marketing plan if they had tried. In fact, all they contributed to the current success of the Trump Vodka brand is their willingness to lie, cheat, and steal from their friends.

92. Similarly, on information and belief, 47 Spirits, 47 Spirits Holdings LLC, and 47 Spirits Holdings MGR LLC have been unjustly enriched as the beneficiaries of Sultan and Patel's misappropriation and other tortious conduct.

93. Defendants knew what they were doing was wrong, but they did it anyway. Sultan and Patel promised to keep the information confidential in December 2024. But then, after reviewing 45 Spirits' business plan, designs, financial projections, licensing terms, and other

[17] *Id.*

proprietary information, they realized they could profit more by stealing the materials and creating their own deal with the Trump Organization. But by no later than May 2025, when they set up 47 Spirits to steal 45 Spirits' information, they had no intention of honoring their promises.

94. Nevertheless, Sultan continued throughout May to send text messages to Mr. Klintworth in Illinois. On information and belief, these texts were designed to delay 45 Spirits' closing with the Trumps. For example, on May 13, Sultan said he had "properties selling towards the end of the month," so he did not believe he could secure the funding as quickly as the end of that week, when Mr. Klintworth hoped the deal would close. On May 26, Sultan apologized for the delay and said the $1.8 million he was receiving from the sale of a property was set to close on June 19. This fake "apology" came *after* Sultan and Patel had already set up 47 Spirits. Thus, it is clear that Sultan exploited his friend's trust by lying to keep Mr. Klintworth from concluding his fundraising efforts and closing 45 Spirits' deal with the Trumps.

95. Sultan and Patel have shown no remorse, despite 45 Spirits' August 19, 2025 demand letter calling out their lies and theft. To the contrary, they have flaunted their ill-gotten gains to the world. In addition to creating the impression that they are the "masterminds" behind Trump Vodka (*supra* ⁋ 86), their social media posts depict ostentatious parties in large ballrooms, expensive supercars, flying in private planes, and taking private helicopters to exclusive golf tournaments to give presentations to potential investors in the Trump Vodka brand.

96. Sultan and Patel seem to believe their business association with the Trump family places them above the law and common decency. If so, they are sorely mistaken.

**COUNT ONE**
**<u>Defend Trade Secrets Act—18 U.S.C. § 1836(b)</u>**
**<u>Against All Defendants</u>**

97. Paragraphs 1 through 96 are incorporated by reference.

98. 45 Spirits developed and owns information that qualifies as trade secrets. Specifically, 45 Spirits developed proprietary operational and business information, including but not limited to the following: Bottle designs and branding concepts; expense calculations, including for inventory, pricing, marketing, and sales; a planned distribution model, including pricing information for 45 Spirits' planned resale and wholesale partners; financial models and projections; margin and profit projections; marketing plans, including compensation for celebrity endorsers; alcoholic beverage licensing plans; salaries for executives and staff; and investor lists. *Supra* ¶¶ 42, 49–50, 56, 60. 45 Spirits also developed confidential licensing terms in its years-long negotiation with the Trump Organization, including upfront payments, future royalties, and other commercial and legal terms. *Supra* ¶¶ 43–44, 56. 45 Spirits also developed detailed financial projections, based on its operational and business plans, which included pricing, inventory costs, sales forecasts, margin and profit projections, marketing expenses, operating costs, salaries, and distribution figures. *Supra* ¶¶ 48, 56, 59. Together, the foregoing information, along with other information Plaintiffs shared with Defendants, constituted trade secrets belonging to Plaintiffs (the "Trade Secrets").

99. 45 Spirits took reasonable measures to protect the secrecy of its Trade Secrets. These measures included sharing information only with those who needed to know after securing those parties' agreement to maintain the confidentiality of the information, as well as designations of the Trade Secrets as "confidential." *Supra* ¶¶ 51, 56.

100. Moreover, 45 Spirits' valuable information was not publicly available and was not readily ascertainable or capable of being reverse-engineered by others, even those skilled in the alcoholic beverages industry. It took Mr. DeCicco, an industry veteran with almost 50 years of experience, and Mr. Klintworth, a successful intellectual property lawyer with extensive

experience negotiating licensing agreements, more than two years to develop the Trade Secrets. Thus, even where individual elements of the Trade Secrets may be known, the unique combination of those elements into a cohesive business model could not have been ascertained or reverse-engineered. Further, the Trade Secrets reflected years of communication on confidential terms to gather input from the Trump Organization. Without these years of effort, it would be impossible to obtain a license for the Trump Vodka brand.

101. The Trade Secrets 45 Spirits developed and owns have derived actual and potential independent economic value from not being generally known to, or readily ascertainable by, others who could obtain economic value from use or disclosure of that unique compilation of information. 45 Spirits' Trade Secrets gave it prime position and the inside track to an immensely valuable business opportunity. Because the Trump Organization initially dealt with Mr. DeCicco, and Messrs. DeCicco and Klintworth spent years developing the business plan, 45 Spirits was uniquely situated to gain the license from the Trump Organization, launch the Trump Vodka brand, and achieve its substantial valuations. On the other hand, if others had known their plans, and the terms of their confidential License Agreement, they could have used them to steal away this vast opportunity—just as Defendants in fact did here. Thus, by taking reasonable measures to ensure that their Trade Secrets stayed secret, Plaintiffs protected themselves and their valuable information and business opportunity from being copied or usurped by others, and the Trade Secrets derived economic value from their secrecy.

102. Defendants misappropriated 45 Spirits' trade secrets, including the core components of a fully developed, turnkey business. Sultan and Patel both received 45 Spirits' trade secrets while under a duty to (1) maintain the information as confidential trade secrets, and (2) use the information only for the purpose of exploring a potential investment in 45 Spirits. That

duty arose from their promises to keep the information confidential, made in communications they initiated and directed to Mr. Klintworth in Illinois, including Sultan's December 12, 2024 call with Mr. Klintworth while he was at his Chicago home office, subsequent calls that Sultan and Patel made to Mr. Klintworth in Illinois later that same day, and the December 13, 2024 calls that Sultan and Patel placed to Mr. Klintworth and Mr. DeCicco while Mr. Klintworth was in Illinois, as well as Sultan's continued promises in multiple phone calls and text messages directed to Mr. Klintworth in Illinois between May 13, 2025 and June 2, 2025. Each of them was also independently subject to a duty of confidence because they knew that 45 Spirits shared its information subject to express confidentiality restrictions, including as reflected in the confidentiality provisions incorporated by reference to 45 Spirits' financial models and Mr. Klintworth's emails of December 12, 2024, and May 13, 2025. Further, Sultan and Patel were given the information for the particular purpose of evaluating whether to invest in 45 Spirits and were therefore under a duty of confidentiality by virtue of that relationship by operation of law. As experienced businessmen, Sultan and Patel knew they had such a duty and intentionally violated it.

103. In violation of their duties of confidence, Sultan and Patel misappropriated Plaintiffs' trade secrets by using them, without authorization, to structure a competing licensing arrangement and replicate Plaintiffs' entire business strategy. While feigning their interest in investing in 45 Spirits, Patel incorporated his own LLC (47 Spirits), and Sultan and Patel used 45 Spirits' Trade Secrets to develop their own business plan and (on information and belief) to solicit the Trump Organization to ditch 45 Spirits in favor of 47 Spirits and a few million dollars more. On information and belief, they, along with 47 Spirits, used 45 Spirits' information to outbid 45

Spirits on the up-front licensing fee, to create a near-identical bottle design, and to generate private investment at a $100 million valuation.

104. 47 Spirits LLC, 47 Spirits Holdings LLC, and 47 Spirits Holdings MGR LLC (collectively "47 Spirits") are also liable for misappropriating 45 Spirits' trade secrets under 18 U.S.C. § 1836(b). On information and belief, Patel is a member of each of the 47 Spirits LLCs, Sultan is a business partner of Patel, and both Patel and Sultan at all relevant times acted as agents of 47 Spirits. 47 Spirits acquired the information from Sultan and Patel, and had reason to know that Sultan and Patel acquired the information by improper means, because 47 Spirits knew, through its agents, the source of the information and the circumstances of its acquisition from 45 Spirits. 47 Spirits in no way prevented Sultan and Patel from using improperly acquired information from 45 Spirits while they were acting as agents of 47 Spirits.

105. Defendants' misappropriation of 45 Spirits' Trade Secrets was willful and malicious, because Defendants knew what they were doing was wrong. Defendants' consciousness of their wrongdoing is reflected, among other ways, in Sultan and Patel deceptively "pumping" additional information from Mr. Klintworth at the same time they organized 47 Spirits to steal 45 Spirits' information and business opportunity, and in the cosmetic changes to 47 Spirits' bottle designs after receiving Plaintiffs' August 19, 2025 demand letter.

106. Plaintiffs were injured as a result of Defendants' misappropriation, while Defendants were unjustly enriched. Plaintiffs spent years developing a patriotic, made-in-America brand and then convincing the Trump Organization that this was the best approach. Plaintiffs created innumerable iterations of the bottle design, and continuously presented them until the Trump Organization approved. Plaintiffs had secured the Trump Organization's approval of the final licensing agreement. 45 Spirits had secured investments at a $50 million valuation and was

ready to close a deal with the Trump Organization's licensing entity, ET Vodka LLC. Based on financial projections, 45 Spirits would have earned $33 million in net revenue in its first year, and $310 million in net revenue in its fifth year. Messrs. DeCicco and Klintworth would have benefitted personally from that revenue. Defendants' misappropriation allowed them to submit to the Trumps a virtually identical business plan, destroying completely the business opportunity that Plaintiffs had spent years of work building, and improperly and unjustly enriching Defendants by reason of their misappropriation.

107. Plaintiffs' damages resulting from Defendants' misappropriation consist of Plaintiffs' actual losses, including without limitation the destroyed value of 45 Spirits' business—worth hundreds of millions of dollars at the time of destruction (based on 45 Spirits' projections using a discounted cash flow method)—and Defendants' unjust enrichment, including all value Defendants derived from their misappropriation. In the alternative or in addition, Plaintiffs are entitled to damages in the form of reasonable royalties commensurate with the contribution of Plaintiffs' information to the success of Defendants' business. The precise amount of damages will be the subject of expert analysis and presentation in pre-trial and trial disclosures.

**COUNT TWO**
**Copyright Infringement—17 U.S.C. § 501(b)**
**Against All Defendants**

108. Paragraphs 1 through 107 are incorporated by reference.

109. 45 Spirits has registered copyrights in the design and taglines of the Trump Vodka bottle. On November 2, 2025, 45 Spirits registered the Trump Vodka Pitch and seven other unpublished works with the United States Copyright Office. The Certificate of Registration bears the number VAu 1-567-926. 45 Spirits LLC, located at 19 N. Green Street, Chicago, IL 60607, is the Copyright Author and Claimant. See Exhibit A. As reflected in this Certificate, 45 Spirits is the copyright owner, and the copyrights are valid and enforceable. The Certificate of Registration

encompasses the bottle designs that 45 Spirits created during its extensive negotiations with the Trump Organization. These designs are referred to collectively as the "Copyrighted Designs." The Copyrighted Designs include the March and April 2025 designs depicted in paragraph 77 above.

110. 45 Spirits commissioned and paid for each of the Copyrighted Designs, which were created as works made for hire and/or were assigned in writing to 45 Spirits. 45 Spirits is the legal owner of the Copyrighted Designs.

111. The "pitch deck" that Mr. Klintworth sent to Sultan on December 12, 2024, contains numerous Copyrighted Designs. Each of these Designs displays a bald eagle holding an American flag in its talons. The phrase "The Spirit of America" appears just below the bald eagle motif. This phrase also appears in 47 Spirits' August 2025 bottle design, depicted in paragraph 77 above.

112. 45 Spirits did not share the subsequent bottle designs with Sultan and Patel. On information and belief, the Trump Organization shared 45 Spirits' bottle designs with Sultan and Patel after 47 Spirits usurped 45 Spirits' opportunity to partner with the Trump Organization.

113. The Copyrighted Designs are original works and are copyrightable subject matter under 17 U.S.C. § 101 *et seq.* They are original, pictorial works, and they do not constitute facts or concepts that are not within the scope of copyright protection. 45 Spirits never assigned or licensed its rights in the Copyrighted Designs to any of the Defendants.

114. Defendants have deliberately and unlawfully copied, manufactured, displayed, reproduced, created derivative works of, adapted, marketed, sold, and distributed 45 Spirits' copyrights in violation of its rights in the Copyrighted Designs.

115. Defendants had an opportunity to view the Copyrighted Designs. Sultan and Patel received some of the Copyrighted Designs directly from Mr. Klintworth when he sent the Trump

Vodka pitch deck to Sultan on December 12, 2024. Further, on information and belief, Sultan and Patel received later iterations of the Copyrighted Designs from the Trump Organization.

116. Defendants' bottle designs are substantially similar to 45 Spirits' March and April 2025 bottle designs, two of the Copyrighted Designs. *Supra* ⁋ 77. The bald eagle motif on the August 2025 47 Spirits bottle is identical to the bald eagle motif on the April 2025 45 Spirits bottle design. The tagline underneath the bald eagle motif in the August 2025 47 Spirits bottle design is identical to 45 Spirits' taglines in March 2025 and December 2024. Defendants' final bottle design exhibits only slight variations to the Copyrighted Designs. The bald eagle motif and taglines remain substantially similar to the 45 Spirits March and April 2025 designs. Moreover, the descriptions on the back labels of Defendants' final bottle design contain substantially similar phraseology to the descriptions on the back label of Plaintiffs' March 2025 bottle design.

117. Defendants' actions constitute willful copyright infringement under 17 U.S.C. § 501. Sultan and Patel knew that 45 Spirits invested significant time and resources in developing its business plans, including producing the Copyrighted Designs. Sultan and Patel nevertheless copied 45 Spirits' designs. Sultan and Patel benefitted from a virtually identical design because the Trump Organization already approved the design that 45 Spirits had submitted in April 2025.

118. Defendants have reaped the benefit of their unauthorized copying in the form of revenue from the sale of bottles using the copied designs. Sultan, Patel, and 47 Spirits let 45 Spirits front the entire cost of designing a logo, tagline, and bottle that would be acceptable to the Trump Organization and would sell widely. The Defendants then took 45 Spirits' design, made minimal changes, and passed it off as their own. On information and belief, Defendants have now sold thousands of bottles bearing infringing designs, including substantial sales in stores and online in

Illinois. 45 Spirits has been robbed of the opportunity to derive revenue from its Copyrighted Designs.

**COUNT THREE**
**Tortious Interference with Business Expectancy**
**Against All Defendants**

119. Paragraphs 1 through 118 are incorporated by reference.

120. Sultan, Patel, and 47 Spirits tortiously interfered with Plaintiffs' business expectancy and relationship with the Trump Organization, Eric Trump, and the entities they set up to license the Trump name to 45 Spirits. This count is based on Defendants' independently wrongful conduct separate and apart from their misappropriation of trade secrets.

121. Plaintiffs had a business relationship with the Trump Organization. Mr. DeCicco first met with President Donald Trump to discuss rebuilding the Trump Vodka brand in May 2022. At that meeting, President Trump told Mr. DeCicco, "Richard, you have a deal, and I guarantee you it's the biggest deal of your life." Mr. Klintworth and Mr. DeCicco then worked with Trump Organization team members for years to negotiate the prospective licensing agreement. Plaintiffs had created the confidential business materials specifically for a Trump Vodka brand with the expectation that the licensing agreement would move forward once they had secured adequate funding to finalize the contract.

122. Plaintiffs' expectancy was far advanced: as of September 2024, the Trumps and 45 Spirits considered the License Agreement "final," subject only to payment of the $7 million upfront licensing fee. By mid-May 2025, 45 Spirits had raised more than $12 million from outside investors and was in the process of scheduling the closing of the deal. All that was left to do was sign the contracts and cut the checks.

123. Defendants knew about Plaintiffs' business expectancy. In fact, they learned all about it from the due diligence materials Mr. Klintworth sent Sultan in December 2024, and the

extra information Sultan extracted from Mr. Klintworth under false pretenses in May 2025. Defendants knew that Plaintiffs intended to close the deal by May 16, 2025. Indeed, one purpose of Sultan's outreach in May 2025 appears to have been to delay 45 Spirits' deal with the Trumps from coming to its final fruition so that Defendants could steal it away.

124. Further, Defendants intentionally and unjustifiably interfered with Plaintiffs' business expectancy. Defendants interfered by pretending to be interested in investing in 45 Spirits in May 2025 to delay 45 Spirits' licensing deal so they could organize a copy-cat company and finalize their own licensing agreement with the Trumps first by targeting the Trumps with the promise of a higher licensing fee. Defendants also falsely promised to keep 45 Spirits' information confidential and use it only for exploring an investment in 45 Spirits. Defendants breached that promise by using 45 Spirits' business information outside the permitted purposes to disrupt 45 Spirits' deal with the Trumps, and to induce the Trumps to replace 45 Spirits with 47 Spirits instead. Defendants acted to steal Plaintiffs' business opportunity to work with the Trumps directly so they could increase their profits as the leaders of this copy-cat vodka company by engaging in unfair competition and misrepresenting their true intentions. This bad faith campaign was conducted with actual malice.

125. Defendants' intentional interference with Plaintiffs' business expectancy with the Trumps injured Plaintiffs by depriving them of that expectancy. Absent Defendants' interference, Plaintiffs would own and operate a business worth hundreds of millions of dollars. Instead, their business is worthless. Plaintiffs are entitled to the value of the stolen expectancy as a measure of reasonable damages.

**COUNT FOUR**
**Fraud**
**Against All Defendants**

126. Paragraphs 1 through 125 are incorporated by reference.

127. Sultan and 47 Spirits LLC defrauded Plaintiffs.

128. Separate and apart from his misappropriation of trade secrets, Sultan made false statements concerning material facts, including on behalf and for the benefit of Patel and all 47 Spirits entities, and did so with the specific intention of inducing Plaintiffs' reliance on those statements. These statements include:

a. On May 13, 2025, Sultan told Mr. Klintworth (in Illinois) "I'm selling a couple of properties and wanted to see if you could still have room inside of that vodka deal." He also claimed that he "got a couple million free up and I'd be interested to see what that would get me."

b. On May 26, Sultan finally responded to Mr. Klintworth (in Illinois), "Sorry for the delay to give you an update on my funds and sale of my properties. I am receiving approx $1.8m from my sale and like I mentioned I need to reinvest it. The escrow funds have gone hard and they are past their due diligence. Closing is set for June 19th."

c. The same day, Sultan said he had the "possibility of getting 4-5m in LOIs this week. You've got to let me know the actual amount, at one point you said 1.75 and now 3-4. I can probably get together up to 5 but let me know the amount."

d. On May 27, Mr. Klintworth asked Sultan when he could "execute the NDA?" Sultan stated: "I'll get right on it."

e. On May 28, Mr. Klintworth explained to Sultan that he had already raised $9.25 million, and that Sultan and Patel could invest $3.8 million. He further explained that this plan would have allowed 45 Spirits to raise an

additional $2 million after the deal closed, but that another $2 million was not necessary to close. Sultan responded to Mr. Klintworth (in Illinois) the same day that he "already let [his] guy know about the 2 million that needs to come up ASAP" and promised to contact the same person about this offer. Sultan also explained that his "guys sound[ed] like they [were] onboard" for the deal.

f. On May 29, Sultan said his contacts "want to form an entity between them" and that he needed "a day to confirm if they are onboard enough to continue if so which one of them exactly and then we'll set up call and nda."

g. On May 30, Mr. Klintworth sent the agreement again and Sultan responded "OK bro, give me just a bit. I'll take a look at this running around at the moment."

129. On information and belief, and in light of the subsequently developing events described above, those statements were false when made, and Sultan knew it. Despite repeatedly assuring Mr. Klintworth that he planned to invest in 45 Spirits, Sultan (and Patel) had no intention of investing in 45 Spirits. On information and belief, by May 13, Sultan's business partner, Patel, was already setting up the copy-cat 47 Spirits LLC to receive the information Sultan and Patel had already decided to steal from 45 Spirits to compete directly against them. 47 Spirits LLC was organized on May 20, 2025 under Delaware law.

130. Sultan told these lies with the intention to induce Mr. Klintworth to share additional confidential information and to hold 45 Spirits' fundraising open. This deception would delay the consummation of the License Agreement 45 Spirits had negotiated with the Trumps, while disincentivizing Mr. Klintworth from securing alternative investors. Sultan's lies were a calculated

ruse designed to buy Sultan and Patel time to outbid Plaintiffs and sign a nearly identical contract with the Trumps.

131. Sultan told these lies on behalf of himself but also, on information and belief, on behalf of Patel and 47 Spirits, the beneficiaries of the information Sultan acquired through his lies to Mr. Klintworth. Additionally, Patel and 47 Spirits ratified Sultan's fraudulent conduct by knowingly accepting and exploiting the information obtained through that fraud.

132. Plaintiffs reasonably relied on Sultan's deliberate lies. When Sultan reached out to Mr. Klintworth in May 2025 to express his and Patel's interest in funding the deal between 45 Spirits and the Trumps, Mr. Klintworth said the deal was "oversubscribed," but that Sultan and Patel's investment could be used instead of another planned investor's. At the time, Mr. Klintworth sought to raise more capital while replacing 45 Spirits' exclusive producer, and Sultan's interest provided an opportunity to do so. Mr. Klintworth had built a trusting relationship with Sultan over the course of their friendship. Further, Sultan repeatedly stated his seeming progress in finding individuals to invest in 45 Spirits and his willingness to sign an NDA. Thus, Sultan falsely promised a large investment in 45 Spirits, and Mr. Klintworth had reason to trust Sultan due to their friendship. Only hindsight provides reasons not to have relied on Sultan and Patel's lies.

133. Plaintiffs were injured as a result of their reasonable reliance on Defendants' deliberate lies. Sultan's false promises suggested the opportunity for Plaintiffs to raise additional capital, incentivizing them to delay closing the deal. As a result, Plaintiffs continually pushed back the closing, including for the purpose of securing Defendants' letters of intent. This delay gave Defendants the time they needed to organize 47 Spirits and secure their copy-cat deal with the Trumps by offering a larger licensing fee. Due in material part to the delays Defendants intentionally caused, Plaintiffs lost the opportunity to close the deal with the Trumps while

Defendants seized that opportunity for themselves. Plaintiffs worked for years to create the business, operations, licensing terms, brand designs, and marketing plans necessary to build a successful brand, and were denied the opportunity as a direct consequence of Defendants' lies and scheme. On information and belief, Defendants now have a successful company selling Plaintiffs' product in stores and online across the United States and abroad. All past and future revenue going to Defendants should belong to Plaintiffs to avoid continued economic injury.

**COUNT FIVE**
**Breach of Contract**
**Against Defendants Sultan and Patel**

134. Paragraphs 1 through 133 are incorporated by reference.

135. Plaintiffs had an agreement with Defendants. Specifically, during a December 12, 2024, phone call between Mr. Klintworth and Sultan, Sultan stated that he wanted to include his friend and business associate Patel in the deal. Mr. Klintworth asked Sultan to promise that, in exchange for providing proprietary information about 45 Spirits for Sultan and Patel to evaluate a potential investment, Sultan and Patel would keep that proprietary information confidential and use it only to evaluate a potential minority investment in 45 Spirits. Sultan agreed. This was a binding agreement.

136. Mr. Klintworth performed his end of the bargain. After receiving Sultan's promise, and in reliance on that promise, Mr. Klintworth sent Sultan an email with attachments that Sultan and Patel could use to evaluate a potential investment in 45 Spirits. The email stated that the documents were confidential in the body and subject line. Further, the financial projections' cover sheet stated that the "reader agrees to the provisions set forth on" the "Disclaimers" page of Finalis.com, which were incorporated by reference. The "Disclaimers" page states that the "document and its contents are confidential to the person(s) to whom they are delivered and should not be copied or distributed . . . to any other person." It further states that the information in the

financial projections is "confidential and is provided for the exclusive use of the recipient and may not be reproduced, provided or disclosed to others, or used for any other purpose, without authorization."

137. Sultan then connected Mr. Klintworth with Patel in a series of text messages on December 12. Mr. Klintworth set up a phone call with Sultan and Patel for later that day. Mr. Klintworth, Sultan, and Patel spoke on December 12. On this call, Patel promised, and Sultan affirmed his promise, to keep the information Mr. Klintworth shared confidential and also promised to sign an NDA.

138. On December 13, Mr. Klintworth and Mr. DeCicco called Sultan and Patel to discuss a potential investment in 45 Spirits. During that call, Sultan and Patel again confirmed their promises to keep the information they had received in Mr. Klintworth's December 12 email confidential and also promised to sign an NDA.

139. On May 13, 2025, Mr. Klintworth sent an NDA to Sultan, asking him to sign. This NDA would have superseded the oral agreement between Mr. Klintworth, Sultan, and Patel. However, until signing the NDA, the parties intended that the oral confidentiality agreement would remain binding. Sultan confirmed this understanding in January 2025, when he assented to Mr. Klintworth's request that he "stay tight lipped." Sultan and Patel did not sign the NDA, so they remained bound by their oral commitment.

140. Despite Mr. Klintworth performing his obligations under their agreement, Sultan and Patel did not keep their repeated promises to preserve the confidentiality of 45 Spirits' proprietary information. Instead, as alleged above, they shared that information with others to generate capital to launch their own copycat business.

141. As Sultan and Patel carried out their plan to misappropriate 45 Spirits' intellectual property, they misrepresented their intention to be bound by their prior agreements to keep 45 Spirits' information confidential. Sultan's communications with Mr. Klintworth in May, in which Sultan stated he would "get right on" signing a written non-disclosure agreement, were delay tactics to misappropriate 45 Spirits' confidential information and continue breaching Sultan and Patel's prior oral agreement to keep 45 Spirits' information confidential in exchange for the opportunity to evaluate their investment. Sultan's statements were knowingly false when made. In light of these misrepresentations, it would be inequitable not to hold Sultan and Patel to their oral confidentiality agreement.

142. As they knew it would, Sultan and Patel's breach of their oral agreement to keep 45 Spirits' proprietary information confidential to launch their own copycat business deprived Plaintiffs of the ability to launch and generate profits from their own business, thereby destroying the entire value of 45 Spirits.

**COUNT SIX**
**Quantum Meruit**
**Against All Defendants**

143. Paragraphs 1 through 142 are incorporated by reference.

144. In the alternative to Count Five, Defendants are liable to Plaintiffs in quantum meruit.

145. Plaintiffs conferred a benefit on Defendants. In his December 12, 2024 email, Mr. Klintworth shared 45 Spirits' proprietary information, including its art for the Trump Vodka bottle label, business plan and "pitch deck," investment term sheet, "final" License Agreement, and financial projections, with Sultan. Mr. DeCicco and Mr. Klintworth spent over two years developing the information shared in that email. Sultan and Patel viewed that information under the auspices of evaluating a potential investment in 45 Spirits. Sultan and Patel shared this

information with 47 Spirits LLC, 47 Spirits Holdings LLC, and 47 Spirits Holdings MGR LLC (the "47 Spirits LLCs") in generating a copycat business plan. Plaintiffs therefore conferred a fully operational, turnkey business on Defendants.

146. Defendants received, retained, and had knowledge of the benefit. Mr. Klintworth originally shared the proprietary information with Sultan and Patel so they could evaluate a potential investment in 45 Spirits, after securing Sultan and Patel's promises of confidentiality. Sultan and Patel then used this information to incorporate the 47 Spirits LLCs, create a near-identical business plan and brand design, solicit investments from outside funders, and usurp 45 Spirits' opportunity to secure a licensing deal with ET Vodka LLC, the Trump Organization's licensing entity for the Trump Vodka brand. This wrongful conduct has proved valuable for Defendants and has, on information and belief, resulted in substantial sales of Trump Vodka products nationwide.

147. In return for conferring a benefit on Defendants, Plaintiffs expected Defendants to evaluate investing in 45 Spirits in good faith, and to keep the information they received confidential. As set forth immediately above, Defendants did neither.

148. The circumstances are such that it would be inequitable for Defendants to retain the benefit without paying the value of it to Plaintiffs. Plaintiffs spent thousands of hours developing the information they shared with Sultan and Patel. Sultan and Patel took that information, created a near-identical brand, usurped the licensing deal that Plaintiffs had nearly consummated, and since then have made few changes to the business plan, marketing strategy, and brand design created by Plaintiffs. Thus, Plaintiffs did all of the work of creating a fully operational business and conferred that benefit on Defendants, who then reaped the reward without compensating Plaintiffs.

**COUNT SEVEN**
**Unjust Enrichment**
**Against All Defendants**

149. Paragraphs 1 through 148 are incorporated by reference.

150. In the alternative to Count Five, Sultan and Patel have been unjustly enriched by their use of information given to them by Plaintiffs.

151. 47 Spirits LLC, 47 Spirits Holdings LLC, and 47 Spirits Holdings MGR LLC have also been unjustly enriched by their use of Plaintiffs' information.

152. Mr. Klintworth and Mr. DeCicco conferred a benefit on Defendants by allowing them access to 45 Spirits' proprietary information, including its art for the Trump Vodka bottle label, business plan and "pitch deck," investment term sheet, "final" License Agreement, and financial projections, as well as information concerning the timing of closing the deal and the status of other investors' interest in May 2025.

153. By permitting Defendants to access 45 Spirits' proprietary information, Mr. Klintworth and Mr. DeCicco were impoverished because they lost the ability to exploit that information for their own benefit, given the exclusive licensing arrangement between Defendants and the Trump Organization regarding the Trump Vodka brand.

154. Defendants knew of the benefit they received, and they voluntarily accepted this benefit. Sultan and Patel knew that all proprietary information they received was valuable, and the reflection of years of hard work to create a new version of the Trump Vodka brand. They accepted the proprietary information while feigning interest in investing in 45 Spirits, and they voluntarily retained the proprietary information at all relevant times.

155. By accepting and retaining these benefits, and not paying Plaintiffs for them, Defendants have been unjustly enriched at Plaintiffs' expense, thereby damaging Plaintiffs. 47 Spirits' version of the Trump Vodka brand is nearly identical to Mr. DeCicco and Mr. Klintworth's

vision for the brand: The bottle design, patriotic themes, price point, and marketing strategy exhibit little variation from the brand described in the proprietary information Mr. Klintworth sent to Sultan and Patel. Defendants therefore devoted little to no time creating their own version of the brand; virtually all of the work had been completed by Mr. DeCicco and Mr. Klintworth, who have not received a dime.

156. The circumstances are such that it would be inequitable for Defendants to retain the benefit without paying the value of it to the Plaintiffs. Mr. Klintworth sent proprietary information to Sultan and Patel in order for them to evaluate an investment in 45 Spirits. As such, the parties orally agreed to keep the proprietary information confidential. In no event did the parties contemplate that Mr. Klintworth gave Sultan and Patel proprietary information so that Sultan and Patel could start a rival company (47 Spirits), use the proprietary information to solicit their own investments and outbid 45 Spirits for a Licensing Agreement with the Trump Organization's licensing entity, and, on information and belief, achieve substantial nationwide sales using a nearly identical business model and brand. But that is exactly what Sultan and Patel did. Any refusal to compensate Mr. DeCicco and Mr. Klintworth for their years of work building the Trump Vodka brand would be inequitable.

**PRAYER FOR RELIEF**

Plaintiffs request relief in the form of:

- Damages under the DTSA, under all available measures (including exemplary damages);
- Damages under the Copyright Act, under all available measures (including statutory damages);
- Damages available at common law (including punitive damages);
- Attorney's fees;
- Prejudgment interest;

- Post-judgment interest; and
- Such other relief as the Court deems just and equitable.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury.

Dated:

Respectfully submitted,

*Karen N. Arenas*

Karen N. Arenas, Ill. Bar No. 6325514
ARENAS LAW LLC
19 N Green Street
Chicago, IL 60607
Telephone: (773) 699-6972
karen@arenas-law.com

Vincent Levy*
Scott M. Danner*
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Ave.
New York, NY 10017
Telephone: (646) 837-5151
Facsimile: (646) 837-0328
vlevy@hsgllp.com
sdanner@hsgllp.com

**Application for Admission Pro Hac Vice Pending*
*Counsel for Plaintiffs*

# EXHIBIT A

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

**Registration Number**
**VAu 1-567-926**
**Effective Date of Registration:**
November 02, 2025
**Registration Decision Date:**
December 23, 2025

## Copyright Registration for a Group of Unpublished Works

Registration issued pursuant to 37 C.F.R. § 202.4(c)

### Title

**Title of Group:** TRUMP VODKA PITCH 2-22-2024c email and 7 Other Unpublished Works

**Content Title:** TRUMP VODKA PITCH 2-22-2024c email
TRUMP VODKA PITCH 2-26-2024a
TRUMP VODKA PITCH 2-26-2024b
labels 2-07
labels 2-09
labels 2-10
labels 2-13
labels 2-16

### Completion/Publication

**Year of Completion:** 2024

### Author

- **Author:** 45 Spirits, LLC
  **Author Created:** Pictorial or Graphic Works
  **Work made for hire:** Yes
  **Domiciled in:** United States

### Copyright Claimant

**Copyright Claimant:** 45 Spirits, LLC
19 N. Green St., Chicago, IL, 60607, United States

### Limitation of copyright claim

**Material excluded from this claim:** B&W portrait photographs; photograph of martini glass ; press photograph ;

photograph of fighting ring ; photograph of concert; photograph of martini glass with golden liquid.

## Rights and Permissions

**Organization Name:** Klintworth & Rozenblat LLP
**Address:** 2045 W. Grand Ave
Ste B, PMB 84396
Chicago, IL 60612 United States

## Certification

**Name:** Robert Reynolds
**Date:** November 02, 2025
**Applicant's Tracking Number:** 45SPR-005

---

**Correspondence:** Yes
**Copyright Office notes:** Regarding group registration: A group of unpublished works may be registered in the same administrative class under 202.4(c) if the following requirements have been met: 1) All the works must be unpublished; 2) the group may include up to ten works; 3) a title must be provided for each work; 4) all the works must be created by the same author or the same joint authors; 5) the authorship claimed in each work must be the same; and 6) the author and claimant for each work must be the same person or organization.

**Registration #:** VAu001567926
**Service Request #:** 1-14997257001

Klintworth & Rozenblat LLP
2045 W. Grand Ave
Ste B PMB 84396
Chicago, IL 60612 United States